## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| SCOTT CHINITZ, derivatively on behalf of FLOTEK INDUSTRIES, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| JOHN W. CHISHOLM, H. RICHARD WALTON, ROBERT M. SCHMITZ, KENNETH T. HERN, JOHN S. REILAND, L.V. MCGUIRE, L. MELVIN COOPER, CARLA S. HARDY, and TED D. BROWN | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| FLOTEK INDUSTRIES, INC., | |
| Nominal Defendant. | |

Plaintiff Scott Chinitz ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Flotek Industries, Inc. ("Flotek" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsels' investigation, which included, *inter alia*, review and analysis of:  (i) regulatory filings made by Flotek with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Flotek; and (iii) other publicly available information, including media and analyst reports, concerning Flotek.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, corporate waste, and unjust enrichment brought on behalf of nominal defendant Flotek against certain officers and members of the Company's Board of Directors (the "Board").

2.      Flotek is a global diversified, technology-driven company that develops and supplies oilfield products, services and equipment to the oil, gas and mining industries, and compounds to companies that make cleaning products, cosmetics, food and beverages and other products that are sold in consumer and industrial markets.

3.      Flotek's Complex nano-Fluid ("CnF") technology is a bio-based, nontoxic technology that is developed from citrus fruit, which is used to facilitate the extraction of oil from formations.  CnF chemistries purportedly improve the productivity of oil and gas wells.

4.      In May 2014, the Company launched FracMax, which supposedly allowed the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary CnF chemistries, *i.e.*, that the use of CnF resulted in greater yields from oil and gas from wells.

5.      According to the Individual Defendants, FracMax is a one-of-a-kind, patent-pending mobile application designed by Flotek, which provides analytical data for hydraulically fractured wells across the United States.

6.      In October 2014, the Individual Defendants caused the Company to announce the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax software platform to provide customized data analysis to oil and gas operators, investors and other companies.

7.      To bolster the Individual Defendants' claims regarding improved productivity, on September 11, 2015, the Company gave an investor presentation (the "September 11

2

Presentation"), which used FracMax to purportedly showed the efficacy of the Company's CnF technology by presenting production data of four proximate wells in Texas (Targac 1H, Gillespie 1H, Molnoskey 1H (CnF) and Berger Unit 1H) that purportedly came directly from the Texas Railroad Commission.

8.     On November 9, 2015, analyst firm Bronte Capital published a report on Flotek (the "Bronte Capital Report") asserting, among other things, that: (1) the production data of Targac 1H, Gillespie 1H and Berger Unit 1H set forth in the September 11 Presentation did not match the production data from the Texas Railroad Commission; and (2) the version of FracMax supposedly available in the Apple iTunes Store does not work.

9.     As a result of the Company's statements to investors, made at the direction of the Individual Defendants, it is clear that the Individual Defendants knew or recklessly disregarded, but failed to disclose that, among other things: (i) Flotek had used false figures in its attempt to evidence the efficacy of CnF; and (ii) FracMax was in fact, not able to provide customized data analysis to oil and gas operators, investors and other companies showing the efficacy of CnF.

10.     Regardless, defendants John W. Chisholm, John S. Reiland, Kenneth T. Hern, L.V. McGuire and Carla S. Hardy were still able to profit from the Company's false and misleading statements regarding CnF's improving productivity and the Company's ability to prove it as each of these defendants sold Flotek stock at artificially inflated prices prior to the publication of the Bronte Capital Report.

11.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein.

12.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Flotek has sustained damages as described below.

## JURISDICTION AND VENUE

13.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides or maintains executives offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES

16.     Plaintiff is a stockholder of Flotek, was a stockholder of Flotek at the time of the wrongdoing alleged herein, and has been a stockholder of Flotek continuously since that time. Plaintiff is a resident of Connecticut.

17.     Nominal Defendant Flotek is a Delaware corporation with its principal place of business located at 10603 W. Sam Houston Parkway N., Suite 300, Houston, Texas.   It is a global diversified, technology-driven company that develops and supplies oilfield products, services and equipment to the oil, gas and mining industries, and compounds to companies that make cleaning products, cosmetics, food and beverages and other products that are sold in consumer and industrial markets. This defendant may be served at its principal place of business,

10603 W Sam Houston Parkway N, Suite 300, Houston, Texas 77064, or wherever they may be found.

18.     Defendant John W. Chisholm ("Chisholm") was appointed Chief Executive Officer in March 2012 and has served as Flotek's President since August 2010, and previously served as Flotek's Interim President from August 2009 through August 2010.  Chisholm has been a Director since November 1999, and has acted as Chairman of the Board since July 2010. Chisholm founded Wellogix, Inc., a software development firm for the oil and gas industry that streamlines workflow, improves collaboration, expedites the inter-company exchange of enterprise data and communicates complex engineered services.  Chisholm also co-founded and served as President of ProTechnics, a service company dedicated to providing completion diagnostic services to the energy industry, from 1985 until its sale to Core Laboratories in December of 1996.  After leaving Core Laboratories as Senior Vice President of Global Sales and Marketing in 1998, he started Chisholm Energy Partners, an investment fund targeting mid-size energy service companies.  Chisholm has served on the board of directors of NGSG, Inc. (NYSE:NGS), a company specializing in compression technology for the oil and gas industry, since December 2006.  He serves on both the Compensation and Governance Committees of NGSG, Inc.  Chisholm has also been selected to be on the editorial advisory board of Middle East Technology by the Oil and Gas Journal. Defendant Chisholm made the following stock sales while in possession of inside information that the stock price of Flotek was artificially inflated:

| Trade Date | Trade Type | Shares | Price | Value |
|------------|------------|--------|-------|-------|
| 2015-08-10 | Sale | 112,000 | $18.47 | $2,069,088 |
| 2015-06-29 | Option Exercise | 700,000 | $1.60 | $1,116,500 |
| 2015-02-16 | Option Exercise | 26,668 | $2.51 | $66,936 |
| 2014-11-21 | Sale | 50,000 | $23.09 | $1,154,700 |

This defendant may be served at his place of business, Flotek Industries, Inc., 10603 W Sam Houston Parkway N, Suite 300, Houston, Texas 77064, his residence of 539 Green Isle Beach, Montgomery, Texas 77356, or wherever he may be found.

19.     Defendant H. Richard Walton ("Walton") has served as the Company's Executive Vice President and Chief Financial Officer at all relevant times until his appointment as Chief Financial Officer Emeritus of the Company on May 29, 2015. This defendant may be served at his place of business, Flotek Industries, Inc., 10603 W Sam Houston Parkway N, Suite 300, Houston, Texas 77064, his residence of 527 Patchester Drive, Houston, Texas 77079, or wherever he may be found.

20.     Defendant Robert M. Schmitz ("Schmitz") has served as the Company's Executive Vice President and Chief Financial Officer since May 29, 2015. This defendant may be served at his place of business, Flotek Industries, Inc., 10603 W Sam Houston Parkway N, Suite 300, Houston, Texas 77064, his residence of 4109 Clover Road, Brenham, Texas 77833, or wherever he may be found.

21.     Defendant Kenneth T. Hern ("Hern") has been a Director, a member of the Compensation Committee, a member of the Audit Committee and the Chairman of the Corporate Governance and Nominating Committee since November 2009.  Furthermore, Hern has served as the Lead Director of the Board since January 2011.  Hern has been a member of the board of directors of Armada Oil and Gas, Inc. and the Chairman of its Governance Committee since its combination with Mesa Energy Holdings, Inc. in March 2013.  Prior to this combination, Hern was a member of the board of directors of Mesa Energy Holdings, Inc. since February 2010. Hern served as the Chairman and CEO of Nova Biosource Fuels, Inc. ("Nova"), an energy company that refined and marketed ASTM standard biodiesel and related co-products through

the deployment of proprietary, patented process technology which enabled broader range use of lower cost feedstock from March 2006 until April 2010.  Nova filed for financial reorganization under Chapter 11 of the United States Bankruptcy Code in March 2009.  Upon the sale of substantially all of Nova's assets under Chapter 11 of the U.S. Bankruptcy Code, the case was resolved by a controlled and structured dismissal ordered by the Delaware Bankruptcy Court in April 2009.  Hern retired from Texaco, Inc. ("Texaco") in 1994 after 25 years of service.  During his tenure with Texaco, Mr. Hern served as President of Texaco Brazil, President of Texaco Saudi Inc., and Vice Chairman and Managing Director of Texaco Nigeria Limited.  Defendant Hern made the following stock sales while in possession of inside information that the stock price of Flotek was artificially inflated:

| Trade Date | Trade Type | Shares | Price | Value |
|------------|-----------|--------|-------|-------|
| 2015-08-19 | Sale | 4,000 | $17.51 | $70,032 |
| 2015-06-02 | Sale | 4,000 | $12.16 | $48,628 |
| 2014-09-08 | Sale | 3,000 | $26.32 | $78,960 |

This defendant may be served at his residence of 12 Bristol Court, Montgomery, Texas 77356, or wherever he may be found.

22.    Defendant John S. Reiland ("Reiland") has been a Director, a member of the Compensation Committee, a member of the Corporate Governance and Nominating Committee and Chairman of the Audit Committee since November 2009.  Reiland is a Certified Public Accountant, and has served as the Chief Financial Officer of The Kabbalah Centre since October 2011.  Reiland served as the Chief Financial Officer of SingerLewak, LLP, from January 2008 until August 2011, an accounting services firm headquartered in Los Angeles, California. Reiland has significant experience in corporate leadership and financing alternatives attributable to his prior roles as Chief Executive Officer, Chief Financial Officer and Chief Accounting

Officer for a myriad of companies in the telecommunications, computer software, and retail industries. From July 2007 until October 2009, Reiland served as a director of the board and Chairman of the Audit Committee for Nova Biosource Fuels, Inc. Nova and certain affiliated entities filed for Chapter 11 financial restructuring under the United States Bankruptcy Code in March 2009. Reiland also served as Chief Financial Officer of NEON Systems, Inc., ("NEON"), a computer software company, from 1996 until 2000, and was instrumental in spearheading NEON's initial public offering ("IPO") in 1999. Defendant Reiland made the following stock sales while in possession of inside information that the stock price of Flotek was artificially inflated:

| Trade Date | Trade Type | Shares | Price | Value |
|------------|------------|--------|-------|-------|
| 2015-11-04 | Sale | 4,380 | $19.21 | $84,152 |
| 2015-08-06 | Sale | 3,686 | $17.26 | $63,635 |
| 2015-02-09 | Sale | 10,000 | $17.53 | $175,290 |

This defendant may be served at his place of business, The Kabbalah Centre, 1062 S. Robertson Blvd., Los Angeles, California 90035, his residence of 825 Country Club Drive, Simi Valley, California 93065, or wherever he may be found.

23. Defendant L.V. McGuire ("McGuire") has been a Director since August 2010, and a member of the Compensation Committee and a member of the Corporate Governance and Nominating Committee since October 2010. McGuire served as the Chairman of the Compensation Committee from December 2010 until May 2014. McGuire is a co-founder of Alpha Petroleum Services, a provider of management-related consulting services to the energy industry. Prior to co-founding Alpha Petroleum Services, McGuire served as a director of the board and Senior Vice President of Mariner Energy Inc. from 1998 to 2001. Prior to joining Mariner Energy, from 1997 to 1998, McGuire served as the Vice President-Operations for Enron Oil & Gas International, Inc. McGuire served, from 1991 to 1996, as the Senior Vice President

responsible for worldwide production operations of the Kerr-McGee Corporation ("Kerr-McGee"). Prior to his position with Kerr-McGee, from 1981 to 1991, McGuire served as Vice President of Operations and as Vice-President of Production for Hamilton Brothers Oil & Gas Ltd. Mr. McGuire began his career with Conoco in 1966. Defendant McGuire made the following stock sales while in possession of inside information that the stock price of Flotek was artificially inflated:

| Trade Date | Trade Type | Shares | Price | Value |
|------------|------------|--------|-------|-------|
| 2015-05-16 | Sale | 7,000 | $27.33 | $191,310 |

This defendant may be served at his place of business, Alpha Petroleum Services, LLC, 16770 Imperial Valley Drive, Suite 220, Houston, Texas 77060, or wherever he may be found.

24. Defendant L. Melvin Cooper ("Cooper") has been a Director, a member of the Audit Committee and a member of the Corporate Governance and Nominating Committee since October 2010, and has been a member of the Compensation Committee since 2011. Currently, Cooper serves as the Senior Vice President and Chief Financial Officer of Forbes Energy Services Ltd. (NASDAQ Global Market: FES), a public company in the energy services industry. Prior to joining Forbes in 2007, Cooper served as the Chief Financial Officer or President of companies involved in site preparation for oil and gas exploration companies, supplying products and service to new home builders, and supply chain management. Cooper is a member of the board of directors and is the Audit Committee Chairman for Par Petroleum Corporation (NYSE:PARR) where he has served since August 2012. In 2014, Cooper was also elected to the Compensation and Corporate Governance Committees of Par Petroleum Corporation. Cooper has been a Certified Public Accountant since May 1977. This defendant may be served at his place of business, Forbes Energy Services, Ltd., 3000 South Business Highway 281, Alice, Texas 78332, or wherever he may be found.

25.     Defendant Carla S. Hardy ("Hardy") joined the Board as a Director, a member of the Corporate Governance and Nominating Committee and a member of the Compensation Committee in May 2013.  Hardy has served as the Chairman of the Compensation Committee since May 2014.  Hardy, a member of the founding family of Florida Chemical Company, Inc., served as non-executive Chairman of the Board of Florida Chemical Company, Inc.  Founded by Hardy's father more than 70 years ago, Florida Chemical (now a wholly-owned subsidiary of Flotek) is one of the largest processor of citrus oils in the world, producing citrus terpines, including d-Limonene, and Flavor and Fragrance compounds.  Hardy's active participation as a stockholder and non-executive board chairman of Florida Chemical from 2006 until 2013 reflects her strong interest in the industry and markets served by Florida Chemical.  While serving as non-executive Chair of Florida Chemical, Hardy was a strategic leader in the evolution of the company from a family-run business to an international specialty citrus-focused chemical company with a professional and collaborative governance structure.  Hardy was instrumental in the merger of Florida Chemical into Flotek, creating the leading international bio-based specialty chemical company focused on renewable and sustainable chemistry for applications across multiple industries, including energy, industrial and consumer products.  Defendant Hardy made the following stock sales while in possession of inside information that the stock price of Flotek was artificially inflated:

| Trade Date | Trade Type | Shares | Price | Value |
|---|---|---|---|---|
| 2015-04-13 | Sale | 40,500 | $17.03 | 689,553 |
| 2014-10-13 | Sale | 104,000 | $20.36 | 2,117,440 |
| 2014-05-27 | Sale | 65,000 | $27.74 | 1,802,905 |
| 2014-05-19 | Sale | 110,000 | $27.35 | 3,008,940 |

This defendant may be served at her residence of 1111 Bryn Mawr Street, Orlando, Florida 32804, or wherever she may be found.

26.     Defendant Ted D. Brown ("Brown") joined the Board as a Director in November 2013, became a member of the Corporate Governance and Nominating Committee in January 2014 and became a member of the Compensation Committee in May 2014.  Brown was Senior Vice President and Advisor to the CEO and President of Noble Energy, Inc. (NYSE: NBL) until his retirement on January 31, 2015.  Brown joined Noble Energy in 2005 in Noble Energy's merger with Patina Oil and Gas.  A lifelong oilman, he joined Amoco Production Company upon completion of his degree in mechanical engineering from the University of Wyoming.  He has also worked in various capacities for Union Pacific Resources, Barrett Resources and Williams Companies. This defendant may be served at his place of business, Noble Energy, 1625 Broadway, Suite 2200, Denver, Colorado 80202, or wherever he may be found.

27.     The defendants referenced above in ¶¶ 18-26 are referred to herein as the "Individual Defendants."

28.     The defendants referenced above in ¶¶ 18 and 21-26 are sometimes referred to herein as the "Director Defendants."

29.     The "Insider Selling Defendants" are defendants Chisholm, Reiland, Hern, McGuire and Hardy.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal

interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Flotek were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

33.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     In addition, the Board has adopted a set of corporate governance guidelines to promote the functioning of the Board and its committees and to set forth a common set of expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

35.     The Corporate Governance Guidelines include the following language:

**IX.  Expectations of Directors**

The business and affairs of the Company shall be managed by or under the direction of the Board in accordance with Delaware law.  In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company.  The Board has developed a number of specific expectations of directors to promote the discharge of this responsibility and the efficient conduct of the Board's business.

\*      \*      \*

**Loyalty and Ethics**

In their roles as directors, all directors owe a duty of loyalty to the Company. This duty of loyalty mandates that the best interests of the Company take precedence over any interests possessed by a director.  The Company has adopted a Code of Business Conduct and Ethics (as provided for by the NYSE), for employees and for nonemployee directors, including compliance programs to enforce the codes.   Collectively, these codes address activities of directors, particularly with respect to transactions in the securities of the Company, potential conflicts of interest, the taking of corporate opportunities for personal use, and competing with the Company.  Directors should be familiar with this Code and should consult with the Company's counsel in the event they have questions about any of the Company's policies with respect to these matters.

36.    As noted above, the Company has also adopted a Code of Business Conduct and

Ethics (the "Code").  The Code states in its preamble:

Flotek Industries, Inc. is committed to ethically and legally conducting its business in every aspect of its operations, either directly or indirectly through any person or entity conducting activity on its behalf.  Our Code of Business Conduct and Ethics ("Code") serves to (1) emphasize the Company's commitment to ethics and compliance with the law; (2) set forth basic standards of ethical and legal behavior; (3) provide reporting mechanisms for known or suspected ethical or legal violations or violations of the Code; and (4) provide notice of expected accountability and ramifications for violations of the Code.  Our Code applies to all officers, directors, employees, consultants, independent contractors and representatives of Flotek Industries, Inc. and each of its subsidiaries.  We use "Company" to collectively refer to those companies, and "we" and "our" to refer to the officers, directors, employees, consultants, independent contractors and representatives of the Company throughout the world who contribute to the Company's reputation for integrity and high ethical standards.

37.    The Code goes on to state:

**I. Business Conduct**

We will avoid misrepresentation of facts, manipulation, concealment, misuse of privileged information, fraud or other unfair business practices.  It is a serious violation of this policy to engage in any act which is intended, or perceived, to harm the reputation, business, prospects, or operations of the Company, our customers, vendors, employees, officers, directors or stockholders.

\*      \*      \*

14

## V.  Compliance with Laws

It is the policy of the Company to conduct business in compliance with all applicable laws, rules and government regulations.  Although we address several important legal areas in the Code, we cannot anticipate every possible situation.  It is the responsibility of employees, officers and directors to know and comply with all applicable laws, conduct all activities in an ethical manner, and report any violations of the law or the Code as set forth herein.

*        *        *

## B.  Unfair Competition and Deceptive Trade Practices

The Federal Trade Commission Act ("FTC Act") and this policy prohibit "unfair methods of competition" and "unfair or deceptive acts or practices."   Many actions not otherwise violating the letter of other antitrust laws, may violate the FTC Act, state antitrust laws, or deceptive trade practices laws.  Each employee, officer and director should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees, and none should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice, including the following, which are examples, but not an exhaustive list, of conduct which has been found to constitute unfair competition or deceptive acts or practices:

• Commercial bribery, including payments made by a seller to its own or a competitor's customer to induce purchases of the seller's products;

• Coercion, intimidation or scare tactics directed against customers, prospective customers, competitors, or suppliers;

 Offering special benefits to distributors who exclude competing product lines;

• Acquiring competitors' trade secrets by unfair means, including espionage;

• *Making false or deceptive statements or comparisons about competitors or their products, business practices, financial status, or reliability*;

• *Misrepresenting the price, composition, effectiveness, quality or other characteristics of a product*;

• *Making an affirmative product claim without a reasonable basis*; and

• Representing our products as those of another manufacturer, such as by simulating a competitor's advertising labels or trademarks.  (Emphasis added).

*        *        *

15

## VI. Administration and Enforcement

Company management and employees are equal partners in ethical and legal behavior and full adherence to the Code. In furtherance of these responsibilities the Company has adopted the following:

### A. Certification of Directors, Officers and Employees

The Code shall be distributed to all officers, directors and employees. Each recipient of the Code will be required to sign a certification stating they have received, read, understand and will abide by the Code, and that they know of no violations of the Code.

38.     Moreover, as noted in the Company's 2015 Proxy Statement: "[t]he Board has an active role, as a whole and at the committee level, in overseeing management of the Company's risks. The Board regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Audit Committee oversees management of financial risks. The Corporate Governance and Nominating Committee manages risks associated with Board independence and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about all identified Company risks."

39.     The Individual Defendants failed to maintain the standards laid out by both the law and themselves, resulting in the breaches of fiduciary duty described herein.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

40.     Flotek is a diversified global supplier of drilling and production products and services to the energy and mining industries.

41.     Flotek's Complex nano-Fluid technology is a bio-based, nontoxic technology that is developed from citrus fruit, which is used to facilitate the extraction of oil from formations. CnF chemistries purportedly improve the productivity of oil and gas wells.

42.     FracMax is supposedly a one-of-a-kind, patent-pending mobile application designed by Flotek, which presents analytical data for hydraulically fractured wells across the United States.

43.     In May 2014, the Company launched FracMax, which allegedly allowed the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary CnF chemistries.  As the Company noted in its 2014 Annual Report filed with the SEC:

> In May 2014, the Company launched its patent pending FracMax<sup>TM</sup> software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid<sup>TM</sup> chemistries.  The Company has integrated the use of the FracMax<sup>TM</sup> software technology into its sales and marketing activities resulting in a significant increase in interest in the Company's Complex nano-Fluid<sup>TM</sup> chemistries.

44.     In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary whose sole purpose is to use the FracMax software platform to provide customized data analysis to oil and gas operators, investors and other companies.

**THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

45.     On August 6, 2014, the Company, at the direction of the Individual Defendants, announced its financial results for the three months ended June 2014.  In the announcement, Defendant Chisholm stated:

> Our growth initiatives – from our patent-pending FracMax™ technology, which conclusively validates the efficacy of our Complex Nano-Fluid™ completion chemistries, to our emerging drilling fluids chemistry solutions which are being adopted by leading global energy companies – are accelerating to create meaningful stockholder value.  While history suggests adoption of disruptive

technologies is not achieved in a straight-line pattern, we are confident the end result of Flotek's portfolio of transformational chemistry, drilling and production technologies are having a positive impact on client outcomes, are being more widely adopted around the globe and, over time, will become standard bearers in an industry focused on improving stockholder returns.  More important, as a result of that success, we will continue to add value for Flotek stockholders.

46.     The announcement went on the say:

The introduction of FracMax, the Company's patent-pending application for comparing the performance of wells using Flotek's advanced next-generation CnF® completion fluids versus those that use conventional surfactants, has been successful in fueling interest in Flotek's innovative chemistries.

47.     And once again quoted Defendant Chisholm:

As a direct result of FracMax, Flotek has added meaningful commercial chemistry validation projects with over a dozen prospective clients across multiple domestic basins. In addition, our team is actively working on 17 other validation projects, creating the most robust prospect book in the history of the Company. This is just the beginning of the impact of FracMax as we believe operators will find it hard to ignore the data which conclusively validates the economic advantage of using CnF® chemistry in completions.

48.     On October 22, 2014, the Company filed a Form 10-Q for the quarter ended September 30, 2014 (the "3Q 2014 10-Q") with the SEC, which provided the Company's quarterly financial results.  The 3Q 2014 10-Q was signed by Defendants Chisholm and Walton. The 3Q 2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Chisholm and Walton, which stated that the financial information contained in the 3Q 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     The 3Q 2014 10-Q touted FracMax and stated, in part:

The Company expects that competition for contracts and margins will remain intense in the future but believes that product innovation, service improvements and quantitative data from its FracMax™ technology will enable the Company to realize market share gains during the remainder of 2014 and into 2015.

50.     On January 27, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results.  The 2014 10-K was signed by Defendants Chisholm and Walton.  The 2014 10- K contained signed SOX certifications by Defendants Chisholm and Walton, which stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     The 2014 10-K touted FracMax and stated, in part:

The Company has integrated the use of the FracMax$^{TM}$ software technology into its sales and marketing activities resulting in a significant increase in interest in the Company's Complex nano-Fluid$^{TM}$ chemistries.

                    *        *        *

The Company also plans to continue to expand the capabilities and use of its patent pending FracMax™ software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

                    *        *        *

Energy Chemical Technologies revenue for the year ended December 31, 2014 increased $67.8 million, or 33.8%, from the prior corresponding period. Excluding the incremental revenue impact of the Florida Chemical, EOGA and SiteLark acquisitions of $10.5 million, revenue increased $57.3 million, or 28.5%, compared with the prior corresponding period, primarily due to the increased sales of stimulation chemical additives, largely the result of the introduction of the Company's proprietary, patent-pending FracMax™ software which statistically demonstrates the positive production and economic impact of using Flotek's CnF® chemistries in unconventional well completions.   The FracMaxTM software has led to a record number of new validation projects and accelerated commercial acceptance of the Company's CnF® completion chemistries.

52.     On April 22, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results.  The 1Q 2015 10-Q was signed by Defendants Chisholm and Walton.  The 1Q 2015 10- Q contained signed SOX certifications by Defendants Chisholm and Walton, which stated that

the financial information contained in the 1Q 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.    The 1Q 2015 10-Q touted FracMax and stated, in part:

The Company also plans to continue to expand the capabilities and use of its patent pending FracMax™ software which should continue to enhance the Company's sales and marketing efforts by validating the production and economic benefits of the Company's core Complex nano-Fluid® chemistries.

The FracMax™ analytical platform is an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries. The FracMax™ application has been integrated into the Company's sales and marketing process leading to new sales opportunities.  In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax™ analytical platform to provide customized data analysis to oil and gas operators, investors and other companies.

*        *        *

The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements and data from its FracMax™ analytical platform will enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

*        *        *

Energy Chemistry Technologies revenue for the three months ended March 31, 2015, decreased $15.7 million, or 25.2%, relative to the comparable period of 2014.  This reduction in revenue virtually mirrored the decrease in the North American active drilling rig count of 25.5% over the comparable periods.  While eroding market conditions are the primary driver of the revenue decrease, Flotek has aggressively pursued strategic relationships with existing customers and has continued to promote the benefits of CnF® in completions and restimulation efforts by leveraging the quantitative evidence validated through the FracMax™ analytical platform.  These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take advantage of any market recovery.

54.    On July 22, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results.  The 2Q 2015 10-Q was signed by Defendants Chisholm and Schmitz.  The 2Q 2015 10-

Q contained signed SOX certifications by Defendants Chisholm and Schmitz, which stated that

the financial information contained in the 2Q 2015 10-Q was accurate and disclosed any material

changes to the Company's internal control over financial reporting.

55.     The 2Q 2015 10-Q touted FracMax and stated, in part:

The Company expects CnF® volumes to continue to outpace the overall industry
activity level due to the distinctive advantage demonstrated by the patent pending
FracMax™ analytical platform which provides quantitative validation of the
improved well economics achieved by utilizing CnF® as part of well
completions.

*        *        *

The Company also plans to continue to expand the capabilities and use of its
patent pending FracMax™ software which will continue to enhance the
Company's sales and marketing efforts by validating the production and
economic benefits of the Company's core Complex nano-Fluid® chemistries.

The patent pending FracMax™ analytical platform is an innovative software
technology that allows the Company to quantitatively demonstrate the benefits
associated with the use of the Company's patented and proprietary Complex
nano-Fluid® chemistries.  The patent pending FracMax™ application has been
integrated into the Company's sales and marketing process leading to new sales
opportunities.   In October 2014, the Company announced the formation of
FracMax Analytics, LLC, a wholly owned subsidiary that will use the patent
pending FracMax™ analytical platform to provide customized data analysis to oil
and gas operators, investors and other companies.

*        *        *

The Company expects that competition for contracts and margins will remain
intense but that product innovation, service improvements and data from its patent
pending FracMax™ analytical platform should enable the Company to realize
relative market share gains during the remainder of 2015 and into 2016.

*        *        *

Energy Chemistry Technologies revenue for the three months ended June 30,
2015, decreased $6.1 million, or 9.8%, relative to the comparable period of 2014,
compared to a 51.0% decline in market activity as measured by average North
American rig count.  Revenue for the six months ended June 30, 2015, decreased
$21.9 million, or 17.5%, relative to the comparable period of 2014, compared to a
37.5% decline in market activity.  The Energy Chemistry Technologies segment
substantially outperformed market activity indicators due to substantial increases

in CnF® sales volumes during the quarter.  CnF® sales volumes increased 76% for the three months ended June 30, 2015 compared to the three months ended March 31, 2015, and increased 34% compared to the three months ended June 30, 2014.  The increased sales of CnF® during the second quarter of 2015 were due to Flotek's aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence provided through the patent pending FracMax™ analytical platform.  These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take even greater advantage of any market recovery.

56.     On September 11, 2015, the Company gave an investor presentation (the "September 11 Presentation"), which included the following slides attempting to show the efficacy of the Company's CnF technology by presenting production data of four proximate wells in Texas (Targac 1H, Gillespie 1H, Molnoskey 1H (Cnf) and Berger Unit 1H) from the FracMax database that purportedly came directly from the Texas Railroad Commission:



**FracMax®**

### About FracMax®

➢ Proprietary hydrocarbon production analytical model allowing comparison of completion technique efficacy.

➢ Based on Flotek's proprietary, patent pending **D**ata **R**ecovery **E**conometric **A**nalytical **M**odelling (DREAM) software, our proprietary FracMax® software uses public data – provided by oil and gas operators – to analyze production results based on completion methods.

➢ Data is sourced from operator-provided completion data from FracFocus and production data from government entities.

➢ The data is un-adjusted, providing for comparison and analysis of operators' self-reported data sets.

FLOTEK
Making a Difference…

\*       \*       \*

22



*     *     *

*     *     *

# FracMax®



*        *        *

# FracMax®



57.     On October 21, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q") with the SEC, which provided the Company's quarterly financial results.  The 3Q 2015 10-Q was signed by Defendants Chisholm and Schmitz. The 3Q 2015 10-Q contained signed SOX certifications by Defendants Chisholm and Schmitz, which stated that the financial information contained in the 3Q 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     The 3Q 2015 10-Q touted FracMax and stated, in part:

The Company expects CnF® sales to continue to outpace general oilfield activity as a result of the distinct benefits of CnF® in unconventional completions as demonstrated by the FracMax® analytical platform, which provides quantitative validation of the improved well economics achieved when CnF® is used in the well completion process.

*        *        *

The Company also plans to continue to expand the capabilities and use of its FracMax® analytical platform, an innovative software technology that allows the Company to quantitatively demonstrate the benefits associated with the use of the Company's patented and proprietary Complex nano-Fluid® chemistries.  The FracMax® application has been integrated into the Company's sales and marketing process leading to new sales opportunities.  In October 2014, the Company announced the formation of FracMax Analytics, LLC, a wholly owned subsidiary that will use the FracMax® analytical platform to provide customized data analysis to oil and gas operators, investors, and other companies.  The Company believes the FracMax® platform, driven by DREAM™ technology, has applications beyond the energy sector and is exploring options to expand the reach of this innovative software platform.

*        *        *

The Company expects that competition for contracts and margins will remain intense but that product innovation, service improvements, and data from its FracMax® analytical platform should enable the Company to realize relative market share gains during the remainder of 2015 and into 2016.

*        *        *

Energy Chemistry Technologies revenue for the three months ended September 30, 2015, decreased $8.0 million, or 11.7%, relative to the comparable period of 2014, compared to a 53.9% decline in market activity as measured by average

North American rig count.  Revenue for the nine months ended September 30, 2015, decreased $29.9 million, or 15.5%, relative to the comparable period of 2014, compared to a 43.2% decline in market activity.  The Energy Chemistry Technologies segment substantially outperformed market activity indicators due to significant increases in CnF® sales volumes during the quarter.  CnF® sales volumes increased 34% (revenues increased 32%) for the three months ended September 30, 2015, compared to the three months ended June 30, 2015.  CnF® sales volumes increased 59% (revenues increased 18%), compared to the three months ended September 30, 2014.  CnF® revenue increases for the year over year period were lower than volume increases due to implementation of incentive pricing structures associated with new strategic relationships in 2014.  The increased sales of CnF® during the third quarter of 2015 were due to Flotek's aggressive promotion of the benefits of CnF® in completions and re-stimulation efforts by leveraging the quantitative evidence provided through the FracMax® analytical platform.  These strategic sales and marketing efforts are ensuring that Flotek remains a leader in the energy chemistry industry and is poised to take even greater advantage of any market recovery.

59.     The statements referenced in ¶¶ 45-58 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that:  (1) FracMax contained data and process errors; (2) the reported production data from FracMax for three of the wells in the September 11 Presentation was inaccurate; (3) FracMax provided no support for the Company's claims that CnF was a superior product; (4) an application from the Company by FracMax made available in the Apple iTunes Store did not work; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading at all times.

## THE TRUTH EMERGES

60.     On November 9, 2015, Australian analyst firm Bronte Capital published a report on Flotek (the "Bronte Capital Report") asserting, among other things, that:  (1) the production data of Targac 1H, Gillespie 1H and Berger Unit 1H set forth in the September 11 Presentation

did not match the data provided by the Texas Railroad Commission; and (2) a version of FracMax available in the Apple iTunes Store did not work.

61.     With regards to the production data, the Bronte Capital Report stated, in part:

### TARGAC 1H

Targac 1H from Sabine Oil & Gas (API#: 42-285-33654) was selected for its location within four miles of the CnF-using Molnoskey 1H (see map on slide 58). Targac, said Chisholm, is an example of a large, expensive well that used substantial amounts of water.

Slide 59 shows production and additive data from FracMax:



Chisholm narrated at 1:07:20 in the replay:

So that particular well there, here's what we want to focus on. 11 million gallons were pumped in that frack job.  Here's the initial production:  eight thousand eight hundred barrels in the first month, no CnF in that well. 'Kay?  11 million gallons, 8800 barrels.

The RRC reports production data by RRC ID#, to which well API#s directly correspond for the four wells of concern to us.  So first we look up the RRC ID using the API #:



Using the RRC's query tool, we lookup the RRC production data for lease ID# 10702.

Let's compare the numbers.

The table below shows, by month, the production data for oil and gas from Targac 1H.   The first column under each of Oil and Gas headings, labeled "FTK – FracMax," reproduces the numbers as shown on Chisholm's slide above that was presented to investors.   The middle column under each of the Oil and Gas headings, labeled "Texas RRC" shows the original production data (not disposition) as reported by the Texas RRC and reproduced in full above.   The final column under each of the Oil and Gas headings simply divides the FracMax number into the Texas RRC number, stated as a percentage.

| Month | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Nov-13 | | 17,761 | | | 21,583 | |
| Dec-13 | 8,886 | 14,810 | 60.0% | 8,699 | 17,397 | 50.0% |
| Jan-14 | 6,431 | 10,719 | 60.0% | 8,555 | 17,110 | 50.0% |
| Feb-14 | 4,919 | 8,198 | 60.0% | 6,115 | 12,230 | 50.0% |
| Mar-14 | 4,552 | 7,586 | 60.0% | 5,935 | 11,869 | 50.0% |
| Apr-14 | 3,610 | 6,016 | 60.0% | 5,694 | 11,387 | 50.0% |
| May-14 | 2,902 | 4,836 | 60.0% | 4,692 | 9,383 | 50.0% |
| Jun-14 | 2,382 | 3,970 | 60.0% | 4,967 | 9,933 | 50.0% |
| Jul-14 | 2,209 | 3,681 | 60.0% | 4,619 | 9,238 | 50.0% |
| Aug-14 | 2,071 | 3,451 | 60.0% | 3,868 | 7,735 | 50.0% |
| Sep-14 | | 2,977 | | | 7,306 | |
| Oct-14 | | 2,678 | | | 7,411 | |
| Nov-14 | | 2,195 | | | 6,934 | |
| Dec-14 | | 2,092 | | | 7,206 | |
| Jan-15 | | 1,950 | | | 4,983 | |
| Feb-15 | | 2,058 | | | 4,702 | |
| Mar-15 | | 2,501 | | | 5,008 | |
| Apr-15 | | 1,719 | | | 3,969 | |
| May-15 | | 1,524 | | | 3,668 | |
| Jun-15 | | 1,369 | | | 3,846 | |
| Jul-15 | | 1,293 | | | 4,529 | |
| Aug-15 | | 1,165 | | | 4,208 | |

*EAGLE-EYED READERS—WHO NO DOUBT SHARE OUR COMMITMENT TO CORRECTNESS—WILL NOTE SEVERAL PROBLEMS HERE.*

- **The production data shown on Chisholm's slide does not match what was reported to the RRC.**

- **The data appears to have been adjusted, as the numbers shown on the FracMax slide total only 60% of the oil production reported to the RRC and 50% of the gas.**

- The first month's oil production was not 8900 barrels in December 2013, but 17,761 in November 2013.

*Chisholm it seems understated production data for the well that contained none of Flotek's special "complex nano-fluid".*

*We gave John Chisholm the benefit of the doubt. We thought this could be a coding or data entry or a simple copy-paste error.*

*Alas we found that this is a pattern rather than isolated error.*

**Gillespie 1H**

Chisholm next presented the Gillespie 1H well (API# 42-285-33673), also from Sabine Oil and Gas, located nearby (see slide 60).

At 1:07:39 in the replay, Chisholm describes Gillespie 1H as a "clone" of the Targac 1H well, as Sabine used a similar set of chemicals:

The operator, Sabine, then went and decided they needed to reduce the size of their jobs. And that's this well right here that they used a clone with. Focus in on this. They reduced the size of the job from 11 million gallons to eight; production went down, 5800 barrels instead of 8800.

Slide 61, reproduced below, shows the production reported by FracMax:



As before, we use the API#, 42-285-33673, to look up the Texas RRC ID #, which is 10811.



After retrieving the production data using ID # 10811, we find that Gillespie has the same undisclosed adjustment as Targac.  Using the same table as we did for Targac, we compare the FracMax numbers from Flotek's slide and the original RRC data.

| Month | Oil (Bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| May-14 | | 13,417 | | | 24,099 | |
| Jun-14 | 5,820 | 9,700 | 60.0% | 9,439 | 18,877 | 50.0% |
| Jul-14 | 4,885 | 8,142 | 60.0% | 8,400 | 16,800 | 50.0% |
| Aug-14 | 3,859 | 6,431 | 60.0% | 6,631 | 13,261 | 50.0% |
| Sep-14 | 3,463 | 5,772 | 60.0% | 5,906 | 11,811 | 50.0% |
| Oct-14 | 3,073 | 5,121 | 60.0% | 5,424 | 10,848 | 50.0% |
| Nov-14 | 2,677 | 4,462 | 60.0% | 5,090 | 10,179 | 50.0% |
| Dec-14 | 2,453 | 4,089 | 60.0% | 4,207 | 8,413 | 50.0% |
| Jan-15 | 2,140 | 3,566 | 60.0% | 4,063 | 8,125 | 50.0% |
| Feb-15 | 1,799 | 2,999 | 60.0% | 3,478 | 6,955 | 50.0% |
| Mar-15 | | 3,597 | | | 7,932 | |
| Apr-15 | | 2,983 | | | 7,039 | |
| May-15 | | 2,817 | | | 6,324 | |
| Jun-15 | | 2,516 | | | 6,485 | |
| Jul-15 | | 2,382 | | | 6,424 | |
| Aug-15 | | 2,197 | | | 6,052 | |

***ONCE AGAIN, THE NUMBERS DON'T MATCH. CHISHOLM CORRECTLY NOTES THAT BOTH WATER USE AND PRODUCTION AT GILLESPIE 1H WERE LOWER THAN AT TARGAC 1H.***

But what he didn't say was that his numbers did not match the official data from the Texas Railroad Commission: production was both a month earlier (May, not June) and substantially higher than he claimed.

## MOLNOSKEY 1H

The Molnoskey 1H well, also by Sabine Oil & Gas, is the punchline of Chisholm's presentation of well comparisons using FracMax screenshots. This is the well that enjoyed the benefit (and pleasing citrus odour) of Flotek's complex nano-fluids, and the other wells were selected for comparison because they are near Molnoskey (slide 62).

Slide 63 shows the additives and production data as reported by FracMax:



Chisholm noted Flotek's complex nano-fluid sold under the trade name "Super Stim 120," and highlighted one ingredient, citrus terpenes. Chisholm then made the key, direct comparison between Molnoskey and Targac, the first well presented. At 1:08:04 in the replay, he stated:

They [Sabine] then came to us and said, we're going to reduce it even further, in fact they called these wells "smurf" wells. And we're gonna run complex nano-fluid.

Focus here on this. Volume six million gallons versus the original one [Targac] of over 11. Production 12.5 thousand gallons in the first month versus eight, so the production's up 50%, the fluid's down 50%, here's complex nano-fluid, in fact it's Super Stim 120, remember FDP? Super- stim in this case they happen to put citrus terpene in there.

This is the key to Flotek's claims of the value of CnF and its FracMax app. Given our experience so far, we should probably double check the numbers. We use API #42-285-33756 to retrieve the Texas RRC ID# of 10920.



But this time the RRC production data for ID# 10920 holds a surprise: while the first month was again omitted, it hasn't otherwise been adjusted at all.  In other words, only for the well with CnF did Flotek report (mostly) the original, unadjusted RRC numbers:

| | Oil (bbl) | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| Month | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Jun-14 | | 18,436 | | | 35,398 | |
| Jul-14 | 12,594 | 12,594 | 100.0% | 25,935 | 25,935 | 100.0% |
| Aug-14 | 9,204 | 9,204 | 100.0% | 20,172 | 20,172 | 100.0% |
| Sep-14 | 6,922 | 6,922 | 100.0% | 16,486 | 16,486 | 100.0% |
| Oct-14 | 5,941 | 5,941 | 100.0% | 13,976 | 13,976 | 100.0% |
| Nov-14 | 5,041 | 5,041 | 100.0% | 14,305 | 14,305 | 100.0% |
| Dec-14 | 4,827 | 4,827 | 100.0% | 12,820 | 12,820 | 100.0% |
| Jan-15 | 4,136 | 4,136 | 100.0% | 12,306 | 12,306 | 100.0% |
| Feb-15 | 3,882 | 3,882 | 100.0% | 9,842 | 9,842 | 100.0% |
| Mar-15 | 4,109 | 4,109 | 100.0% | 9,204 | 9,204 | 100.0% |
| Apr-15 | | 3,407 | | | 7,420 | |
| May-15 | | 3,222 | | | 7,303 | |
| Jun-15 | | 2,881 | | | 6,760 | |
| Jul-15 | | 2,330 | | | 5,993 | |
| Aug-15 | | 2,180 | | | 5,041 | |

\*        \*        \*

## BERGER 1H

The final well Chisholm highlighted was the Berger 1H Unit from Devon Energy, a nearby well (slide 64) that he told us had no CnF.  A screenshot from FracMax reports Berger's additives and production (slide 65):



Chisholm narrated at 1:08:43 in the replay:

Wanted to show you the well right next door to that CnF well was with . . . by
Devon.  Uh . . . amount of fluid 5.9 million, less than half the production.  Right
next door.  To the well that had CnF in it, with a similar amount of fluid in the
frack job.  This type of data analysis was absolutely [sic] no way Flotek had
access to it 'till we invented FracMax.  Absolutely no one else in the industry has
it.

Using the API#42-285-33802, we retrieve its RRC Lease ID#10972:



*AS ABOVE, WE LOOK UP THE PRODUCTION DATA FOR BERGER FROM THE RRC USING ID# 10972. ONCE AGAIN, FLOTEK'S REPORTED PRODUCTION DATA FROM FRACMAX DOES NOT MATCH THE RRC'S, AS THE BY-NOW-FAMILIAR TABLE BELOW SHOWS:*

| Month | Oil [bbl] | | | Gas (Mcf) | | |
|---|---|---|---|---|---|---|
| | FTK - FracMax | Texas RRC | % of RRC | FTK - FracMax | Texas RRC | % of RRC |
| Sep-14 | | 8,547 | | | 15,046 | |
| Oct-14 | | 12,817 | | | 16,140 | |
| Nov-14 | 5,022 | 8,370 | 60.0% | 3,936 | 7,872 | 50.0% |
| Dec-14 | 3,743 | 6,238 | 60.0% | 5,002 | 10,004 | 50.0% |
| Jan-15 | 2,946 | 4,910 | 60.0% | 4,880 | 9,759 | 50.0% |
| Feb-15 | - | - | | 10,036 | 20,071 | 50.0% |
| Mar-15 | 1,997 | 3,328 | 60.0% | 6,103 | 12,205 | 50.0% |
| Apr-15 | 2,371 | 3,952 | 60.0% | 6,605 | 13,210 | 50.0% |
| May-15 | 567 | 945 | 60.0% | 899 | 1,798 | 50.0% |
| Jun-15 | | 5,878 | | | 9,209 | |
| Jul-15 | | 3,182 | | | 9,465 | |
| Aug-15 | | 3,500 | | | 7,189 | |

Where before Flotek omitted the first month of production (usually the largest), in this case they have omitted the first two months of September and October 2014, as well as the most recently reported month, June 2015.  And we find again the same undisclosed alteration of the RRC's data, as FracMax displays only 60% of the RRC's number for oil and 50% for gas.

Chisholm compared Berger and Molnoskey directly, as the two wells are nearby and used a similar amount of water, but only Molnoskey contained CnF. Berger, Chisholm said, had "less than half the production," presumably intending for his investor audience to conclude that CnF made the difference.  While Molnoskey clearly produced more oil in its first 10 months, the difference is far less stark

35

once the full RRC production numbers – including the missing months – are taken into account.

(Emphasis added).

62.     With regards to the version of FracMax available in the Apple iTunes Store, the

Bronte Capital Report stated, in part:

**TRYING THE FRACMAX APP (?)**

A version of what claims to be FracMax is available in the Apple iTunes Store under the name "Flotek Max."  Released on 17 February 2015, the description of the app fits the public descriptions of FracMax:



A quick but important caveat: we cannot know for certain if this is the app Chisholm demonstrated or the app used by Flotek's sales force.  It is entirely possible – likely, even – that another version of FracMax exists.  That said, our reading Apple's policies make it unlikely that a parallel private app exists.

With that caveat out of the way, we do what we can to try to use the app.

We find the same Flotek application pictured in the consumer app store above:



Clicking on the link leads us to the same page as before, except with "Volume Purchase Program" as the header:



(Note the section on "Managed Distribution" on the webpage above. It indicates that free apps are only available in bulk when using a "Mobile Data Management" solution, which implies control over the end user's iPad. This form of distribution

would be more common within a single enterprise whose mobile devices are managed centrally.)

***ANYWAY, WE DOWNLOADED THE ITUNES STORE APPLICATION – THE FIRST ONE SHOWN, FROM THE CONSUMER APP STORE – AND TRIED TO RUN IT ON TWO SEPARATE IPADS, EACH RUNNING THE LATEST VERSION OF IOS (ONE AN IPAD 4TH GENERATION THE OTHER AN IPAD MINI 4).***

**On neither iPad we tried did the application work.**  First, it asked for access to the camera, for what purpose we do not know.  Next, it simply displayed a black screen with a set of red bubbles, much like the screenshot of the business card in the app store images above – except without any discernable image in the background.  No amount of tapping or dragging or swiping or pinching could persuade it to do anything.

We would love if other readers could try to load the app.  At last testing it crashed both our ipads.

This is curious as Flotek tells us that this app is responsible for the fantastic recent sales performance.  (Also curious is the claim in the app store description that the data is updated weekly; as the images show, the latest version of the app was released on 17 February 2015.)

As we can't run FracMax – or an app from Flotek claiming to be FracMax, anyway – accuracy-minded investors like us can't check other wells.  It would be fascinating if Mr Chisholm's faulty data is repeated over the whole United States.  That would be deeply "curious".

And we like a good stock puzzle – especially one where the management seem to make it up.

(Emphasis added).

63.     On this news, shares of Flotek fell $3.50 per share or over 19% to close at $14.60 per share on November 9, 2015.

64.     On November 10, 2015, the Company issued a press release acknowledging data and process errors in FracMax database and the understatement of production data in the September 11 Presentation, stating in part:

HOUSTON, Nov. 10, 2015 /PRNewswire/ In conjunction with Flotek Industries, Inc. ("Flotek" or the "Company") presentation at the Stephens, Inc. Fall Investment Conference in New York City, Flotek provides the following update on the ongoing development and evolution of the Company's FracMax® data analytics and visualization software application.

38

Flotek has carefully reviewed a recent report regarding the validity of the data from the Company's FracMax® database by analyzing data from a small subset of wells in FracMax®. The analysis suggests the production data presented by Flotek – for three of the wells analyzed – were misinterpreted by Flotek and understated the production of those wells.

"We take any contention of errors in our data, processes and analysis very seriously," said John Chisholm, Chairman, President and Chief Executive Officer of Flotek. "We appreciate the thorough analysis provided in the report and are using this critique as well as others to improve our FracMax® application to ensure both the validity and reliability of the underlying data as well as the accuracy of the analytical processes."

As a result of our initial review of the report we have concluded that the FracMax® database – partly a result of third party data used by Flotek – identified the three wells in question to be contained in units with multiple wells (the state of Texas organizes production reporting by units, or leases, that report total production in the aggregate). The FracMax® application uses algorithms to assign production to individual wells within multiple well units. In this case, the report contends that the wells in question were on single well units and, as a result, 100% of the production from those units should be assigned to the identified wells. After review of the report, data from the Texas Railroad Commission as well as other third party data providers, it appears that the wells in question are single well units.

While the adjustment does impact the magnitude of the outperformance of the well completed using CnF® when compared to the nonCnF® treated wells, it does not, the Company believes, change the conclusion that the CnF® well outperformed the nonCnF® wells, especially when normalized for the length of the lateral completion zone.

"While we are concerned by the unintentional data and processing error that led to this unitization miscalculation and are taking aggressive steps to ensure this process is immediately corrected, our analysis of the wells in question concludes the use of CnF® improved productivity when compared to the neighboring wells that did not use CnF® in the completion process," said Chisholm. "Moreover, Sabine Oil & Gas – the operator of three of the wells in question – continues to use CnF® on its completions, an indication that Sabine's internal data show compelling benefits from the use of Flotek's Complex nanoFluids® suite of completion chemistries."

The Company has conducted an initial review of the FracMax® database and has determined that this data and process error does not impact the vast majority of wells in the database which appear to be unitized appropriately by the software application. "In fact, there were several other wells in the investor presentation that were unitized and reported correctly, showing the benefits of CnF® that were not discussed or referred to in the report," added Chisholm.

"While FracMax® is an important tool in the development of new markets for CnF®, the most important determinant of the success of CnF® is the actual performance of the Company's completion chemistry in the wells of new and existing clients," said Chisholm.  "The growth in validations that result in new commercial customers is the ultimate proof of the efficacy of our completion chemistries.  Our clients and their experiences – as seen through their own proprietary production data – are by far the best evidence of the performance enhancing nature of CnF®."

The number of production companies using CnF® in the completion process continues to grow with a consistent flow of validation projects for operators of all sizes.

65.    In the same press release, the Company stated the following with regards to

FracMax:

FRACMAX® PUBLIC AVAILABILITY

A final assertion made in the report claims that attempts to download FracMax® for personal use resulted in iPad malfunctions and no success in obtaining an operating version of the software application.  The author concludes that the program does not operate properly.

As the Company has consistently noted since inception, FracMax® is a proprietary software application for the exclusive internal use of Flotek employees.  While the Company is preparing to release a new version of the software available for use by operators, FracMax® is not currently available outside of Flotek employees.  A key code as well as other security requirements are necessary to obtain a working copy of the FracMax® application.  This has been a consistent policy since FracMax® was introduced in 2014.

66.    On this news, shares of Flotek fell $5.56 per share or over 38% to close at $9.04

per share on November 10, 2015, further damaging investors.

67.    On November 11, 2015, Bronte Capital responded to the Company's November

10 press release, stating in part:

VIDEO RAISES DOUBTS OVER FLOTEK'S MOST RECENT STATEMENTS

*Flotek (NYSE:FTK) put out an SEC filing in which they admitted the substantial points in my last blog post.  The data that they presented proving the efficacy of FracMax was inconsistent with the official data at the Texas Railroad Commission and wrong.*

40

They argued that FracMax and their "complex nano-fluid" [CnF] worked nonetheless.

*       *       *

They however denied one suggestion in my original post. Flotek had long said that FracMax – an oil-field-database iPad app was a key to their sales success. However the iPad app crashed two iPads and clearly did not perform its stated function.

Here is what Flotek said in the SEC filing.

A final assertion made in the report claims that attempts to download FracMax® for personal use resulted in iPad malfunctions and no success in obtaining an operating version of the software application. The author concludes that the program does not operate properly.

As the Company has consistently noted since inception, FracMax® is a proprietary software application for the exclusive internal use of Flotek employees. While the Company is preparing to release a new version of the software available for use by operators, FracMax® is not currently available outside of Flotek employees. A key code as well as other security requirements are necessary to obtain a working copy of the FracMax® application. This has been a consistent policy since FracMax® was introduced in 2014.

***In other words they stated that there is no version of FracMax available to people who are not FloTek employees.***

This claim, however, is directly contradicted by the video that Flotek presented on their investment day in September. This video ends with a long claim for the benefit of FracMax. To quote:

Now US and National Oil Companies can license a versions of the application customized to them on a FracMax centric Apple iPad which offers the ability to import specific reservoir and production software outputs for individual wells. Its associated FracMax Halo Technology enables selection of unique data fields for the particular user.

With the Flotek FracMax app hundreds of hours' worth of detailed and potentially expensive return on investment analysis is available with the touch of a screen.

It's more impactful and convenient than ever to experience the real world benefit of CnF, an innovation that is revolutionizing an industry by truly making a difference.

You can touch it, you can see it, and now you can believe it. Your data has become intelligent in a way never imagined.

The future is here.

*This version of FracMax is clearly available to non-Flotek employees.*

*I hope that Flotek can show us at least one modified version of FracMax useable by third parties.  Or they can somehow explain away that video.*

*Or otherwise it is simple.*

*There is a major misrepresentation with likely severe legal ramifications.  And it will get ugly.*

(Emphasis added).

## DAMAGES TO FLOTEK

68.    As a result of the Individual Defendants' wrongful conduct, Flotek disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Flotek's credibility. Flotek has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

69.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Flotek to a complaint for violation of the federal securities laws in the United States District Court for the Southern District of Texas, captioned *Ho vs. Flotek Industries, Inc., et al.*, 4:15-cv-03327 (the "Securities Class Action").

70.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Flotek's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

71.    Moreover, these actions have irreparably damaged Flotek's corporate image and goodwill.  For at least the foreseeable future, Flotek will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Flotek's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.     Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

74.     Plaintiff is an owner of Flotek common stock and was an owner of Flotek common stock at all times relevant hereto.

75.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

76.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Flotek Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

77.     At the time this action was commenced, the Board consisted of seven directors: Defendants Chisholm, Hern, Reiland, McGuire, Cooper, Hardy and Brown.  All seven members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THE DIRECTOR DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

78.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC

filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

79.     Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

80.     The Director Defendants' making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Flotek to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

**DEFENDANT CHISHOLM LACKS INDEPENDENCE**

81.     As an initial matter, Flotek has conceded in its SEC filings that Chisholm is not an independent director of the Company.  In its March 27, 2015 annual proxy statement[1], Flotek states that:

> Mr. Chisholm is not an independent director since he is currently the President and Chief Executive Officer of the Company.

82.     In addition to this lack of independence, Chisholm is not disinterested for purposes of demand futility because his principal occupation is President, CEO and Chairman of the Board of Flotek.   According to the Company's SEC filings, between 2012 and 2014, Chisholm received total compensation of $4,347,229, $2,797,269, and $5,670,097, respectively.

83.     Moreover, as noted above, Chisholm personally benefited from the Individual Defendants false and misleading statements by having the opportunity to sell over 162,000 shares of Flotek stock at artificially inflated prices.

84.     Defendant Chisholm is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS EXCUSED BECAUSE A MAJORITY OF THE CURRENT BOARD MEMBERS ARE NOT DISINTERESTED AS THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

85.     Defendants Chisholm, Hern, Reiland, McGuire, Cooper, Hardy and Brown are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.

---

[1] *See* Flotek, Annual Proxy Statement (Form 14A) (Mar. 27, 2015).

**DEFENDANTS HERN AND REILAND ARE UNABLE TO INDEPENDENTLY CONSIDER A DEMAND DUE TO THEIR BUSINESS AFFILIATIONS**

86.     Defendants Hern and Reiland lack the independence required to impartially consider a demand by Plaintiff due to their longstanding business relationship.  Hern served as the Chairman and CEO of Nova from March 2006 until April 2010.  Likewise, from July 2007 until October 2009, Defendant Reiland served as a director and Chairman of the Audit Committee for Nova.  This, of course, is in addition to Defendants Hern and Reiland both being appointed to the Board in November 2009.

87.     This longstanding and extensive professional relationship between Defendants Hern and Reiland renders Hern and Reiland incapable of independently considering a demand to sue one another, rendering demand on these directors, futile.

**DEMAND IS FUTILE AS TO DEFENDANTS CHISHOLM, HERN, REILAND, MCGUIRE, AND HARDY BECAUSE THEY FINANCIALLY BENEFITED FROM THE ABOVE-REFERENCED FALSE AND MISLEADING STATEMENTS**

88.     As noted above, Defendants Chisholm, Hern, Reiland, McGuire, and Hardy personally benefited from the Individual Defendants false and misleading statements by having the opportunity to sell shares of Flotek stock at artificially inflated prices, a benefit not shared by the rest of Flotek's stockholders.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS FOR THE FOLLOWING ADDITIONAL REASONS**

89.     If Flotek's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiffs are informed and believe that the D&O Insurance policies covering the Individual Defendants in

this case contain provisions that eliminate coverage for any action brought directly by Flotek against the Individual Defendants, known as the "insured versus insured exclusion."

90.     As a result, if the Director Defendants were to sue themselves or certain of the officers of Flotek, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

91.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Flotek by prosecuting this action.  Therefore, demand on Flotek and its Board is futile and is excused.  Flotek has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

92.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

93.     The Individual Defendants each owed Flotek and its stockholders the fiduciary duties of loyalty, good faith, candor and due care in managing and administering the Company's affairs.

94.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Flotek.

95.     The Individual Defendants breached their fiduciary duties owed to Flotek and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Flotek's business, rendering them personally liable to the Company.

96.     Each of the Individual Defendants had actual or constructive knowledge that the Company falsely stated the efficacy of the Company's CnF technology by misrepresenting production data of four proximate wells in Texas that purportedly came directly from the Texas Railroad Commission.  The Individual Defendants further breached their fiduciary duties by knowingly causing and/or allowing the Company to make false and misleading statements regarding the Company's FracMax application.

97.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties of loyalty, good faith, candor and due care, as alleged herein, Flotek has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST INSIDER SELLING DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY IN CONNECTION WITH INSIDER STOCK SALES

98.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

99.     At the time of each of the stock sales set forth herein, the Insider Selling Defendants knew, but did not disclose publicly, that the Company falsely stated the efficacy of the Company's CnF technology by misrepresenting production data of four proximate wells in Texas that purportedly came directly from the Texas Railroad Commission.  The Insider Selling Defendants further knew, but did not disclose publicly, that the Company's FracMax application was not in fact functional and was being touted by the Individual Defendants solely to bolster the Company's CnF efficacy claims.  The Insider Selling Defendants made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

100.     At the time of their stock sales, the Insider Selling Defendants knew that when the Company's improper practices came to light, the price of the Company's common stock would dramatically decrease.  The Insider Selling Defendants' sales of Flotek common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

## COUNT III

### AGAINST ALL INSIDER SELLING DEFENDANTS
### FOR UNJUST ENRICHMENT

101.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

102.    The Insider Selling Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of Flotek common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

103.    To remedy the Insider Selling Defendants' unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Flotek common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Flotek and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.    Ordering the Insider Selling Defendants to disgorge to the Company all proceeds derived from their sales of Flotek common stock alleged herein;

D.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 19, 2015

Respectfully submitted,

*/s/ John H. McFarland*_____

John H. McFarland
Federal ID No. 19423
Texas State Bar No. 00794270
**JOYCE + McFARLAND LLP**
712 Main, Suite 1500 (East)
Houston, TX 77002
Tel (713) 222-1114
Fax 713.513.5577
jmcfarland@jmlawyers.com

*Liaison Counsel for Plaintiff*

J. Brandon Walker
**BRAGAR EAGEL & SQUIRE, P.C.**
885 Third Avenue, Suite 3040
New York, NY 10022
(212) 308-5858

Michael J. Hynes
**HYNES KELLER & HERNANDEZ, LLC**
1150 First Avenue, Suite 501
King of Prussia, PA 19406
(610) 994-0292

*Counsel for Plaintiff*

## VERIFICATION

I, SCOTT CHINITZ, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

December ⅄ 2015

Scott Chinitz